118 T.C. No. 3

UNITED STATES TAX COURT

FRAMATOME CONNECTORS USA, INC., PRESENTLY KNOWN AS FRAMATOME
CONNECTORS USA HOLDING INC., AND SUBSIDIARIES, AND BURNDY
CORPORATION PRESENTLY KNOWN AS FRAMATOME CONNECTORS USA INC.
Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

FRAMATOME CONNECTORS USA, INC., AND SUBSIDIARIES, N.K.A.
FRAMATOME CONNECTORS USA HOLDING INC., AND SUBSIDIARIES,
Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5030-98, 9160-99.    Filed January 16, 2002.

Controlled Foreign Corporation Issue:  In 1992,
Burndy-US (B-US), a predecessor of Framatome Connectors
USA, Inc., one of the petitioners (Ps), owned 50
percent of the stock of Burndy-Japan (B-J).  Furukawa
Electric Co. (F) and Sumitomo Electrical Indus., Ltd.
(S), each owned 25 percent of the stock of B-J.

Ps contend that B-US owned more than 50 percent of
the voting power of B-J stock and owned more than 50
percent of the value of B-J stock, and that, as a
result, B-J was a controlled foreign corporation (CFC)
in 1992 under both sec. 957(a)(1) and (2), I.R.C.

Held:  B-J was not a CFC in 1992 because B-US did not own more than 50 percent of the voting power of B-J stock or more than 50 percent of the value of B-J stock.

Constructive Dividend Issue:  In 1993, B-US transferred to Framatome Connectors International (FCI), its French parent, assets worth more than the assets that B-US received from FCI.  The parties dispute whether these transfers were constructive dividends paid by B-US in 1993 which are subject to withholding tax under sec. 1442, I.R.C.

Held:  Transfers by B-US to FCI of assets worth more than the assets B-US received from FCI were constructive dividends which were actually distributed for purposes of the U.S.-France Tax Treaty, Convention With Respect to Taxes on Income and Property, July 28, 1967, U.S.-Fr., 19 U.S.T. 5281, and thus, were subject to withholding tax under sec. 1442, I.R.C.

Mark A. Oates, Marc M. Levey, Erika Schaefer Schechter, A. Duane Webber, William S. Garofalo, Kathryn D. Weston-Overbey, and Thomas J. Kinzler, for petitioners.

Theodore J. Kletnick, Jill A. Frisch, Elizabeth Flores, Steven D. Tillem, Murali Balachandran, and Robert T. Bennett, for respondent.

TABLE OF CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . 5

A.   Petitioners, Their Predecessors, Furukawa, and
     Sumitomo . . . . . . . . . . . . . . . . . . . . . . 5
     1.   The Framatome Companies . . . . . . . . . . . 5
     2.   Burndy-US . . . . . . . . . . . . . . . . . . 5
     3.   Furukawa and Sumitomo . . . . . . . . . . . . 7

B.   Japanese Ministry of International Trade and
     Industry . . . . . . . . . . . . . . . . . . . . 7

C.   Burndy-Japan . . . . . . . . . . . . . . . . . . . 8
     1.   Formation . . . . . . . . . . . . . . . . . . 8
     2.   Agreements Between Burndy-US, Furukawa, and
          Sumitomo From 1962 to 1973 . . . . . . . . . 9
     3.   1973 Basic Agreement . . . . . . . . . . . 10
     4.   Burndy-Japan's Presidents and Board of
          Directors . . . . . . . . . . . . . . . . . 12
     5.   1988 Technical Assistance Agreement . . . . 13
     6.   Burndy-Japan's Independence From Burndy-US . 14
     7.   Burndy-US's Purchase of 40 Percent of the
          Stock of Burndy-Japan in 1993 . . . . . . . 15

D.   Withholding Tax Issue . . . . . . . . . . . . . . 17
     1.   Purchase of TRW Daut & Reitz by Burndy-US . 17
     2.   Transfer of 40 Percent of Burndy-Japan Stock
          to Burndy-US in 1993 . . . . . . . . . . . 19

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . 20

A.   Whether Burndy-Japan Was a Controlled Foreign
     Corporation in 1992 . . . . . . . . . . . . . . . 20
     1.   Voting Power Test and Stock Value Test  . . 20
     2.   Whether Burndy-US Owned More Than 50 Percent
          of the Total Combined Voting Power of the
          Stock of Burndy-Japan . . . . . . . . . . . 22
     3.   Whether Burndy-US Owned More Than 50 Percent
          of the Value of Burndy-Japan Stock . . . . . 47

B.   Whether Petitioners Are Liable for
     Withholding Tax . . . . . . . . . . . . . . . . . 52
     1.   Contentions of the Parties . . . . . . . . . 52
     2.   Whether Burndy-US Transferred Excess Value
          to FCI in 1993 . . . . . . . . . . . . . . . 53
     3.   The U.S.-France Tax Treaty and
          1988 Protocol . . . . . . . . . . . . . . . 64
     4.   Conclusion . . . . . . . . . . . . . . . . . 67

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioners' income and withholding taxes and a penalty as follows:

| Year | Income tax deficiency | Sec. 6662[1] penalty | Withholding tax deficiency |
|------|------|------|------|
| 1991 | $1,733,207 | $380,298 | |
| 1992 | 753,456 | 256,626 | |
| 1993 | 24,892,344 | 4,978,469 | $2,700,316 |

[1] Unless otherwise specified, section references are to the Internal Revenue Code in effect in the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, we must decide:

1. Whether Burndy-Japan Ltd. (Burndy-Japan) was a controlled foreign corporation (CFC) of Burndy Corp. (Burndy-US)[1] in 1992. We hold that it was not because Burndy-US did not own more than 50 percent of the voting power of Burndy-Japan stock or more than 50 percent of the value of Burndy-Japan stock in 1992.

2. Whether transfers from Burndy-US and Framatome Connectors USA, Inc. (Framatome US), now known as Framatome Connectors USA Holding, Inc., to Framatome Connectors International (FCI), their parent corporation, of assets worth more than the assets that Burndy-US received from FCI were constructive dividends subject to withholding tax under section 1442. We hold that they were to the extent described below.

---

[1] References to Burndy Corp. (Burndy-US) include its successors in interest, such as Framatome Connectors USA, Inc., and Framatome Connectors USA Holding, Inc.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.    Petitioners, Their Predecessors, Furukawa, and Sumitomo

1.    The Framatome Companies

Petitioner Framatome US is a New York corporation, the principal place of business of which was in Connecticut when the petitions were filed. Framatome S.A., a French company, owned 100 percent of FCI, another French company, which owned 100 percent of Framatome US during the years in issue.

Framatome S.A. designed, sold, built, and serviced nuclear power units. Framatome S.A. decided to diversify. Around 1988, Framatome S.A. formed FCI to acquire and hold businesses which manufactured electrical and electronic connectors. Electric utility companies use electrical connectors to connect cables or wires. Manufacturers use electronic connectors in machines, appliances, computers, and electronic products. FCI formed Framatome US in 1988 to acquire all of the outstanding shares of Burndy-US (described next) and its subsidiaries, which manufactured electrical and electronic connectors.

2.    Burndy-US

Burndy-US was a predecessor corporation of Framatome US and Framatome Connectors USA Holding, Inc. Burndy-US manufactured electrical and electronic connectors before 1989.

Key Burndy-US officers and employees included Richard Farley (Farley), president of Burndy-US in 1972 and board member until 1989; Ernest Fanwick (Fanwick), general counsel of Burndy-US in 1970 and later vice president, general counsel, and secretary of Burndy-US until 1989; Michael Cantor (Cantor), a general consultant for Burndy-US in Japan from 1963 to 1980; and Theodore York (York), a Burndy-US employee from 1964 to 1994, the general manager of one of Burndy-US's domestic electrical businesses in 1980, later manager of several Burndy-US overseas subsidiaries, and a director of Burndy-Japan (described below at page 8).

Burndy-US owned all of the stock of the following European subsidiaries before 1989: Framatome Connectors Belgium N.V. (FC-Belgium); Framatome Connectors Schweiz A.G. (FC-Switzerland); Framatome Connectors Espana (FC-Spain); Framatome Connectors Italia (FC-Italy); Framatome Connectors Deutschland GmbH (FC-Germany); Framatome Connectors U.K. Ltd. (FC-United Kingdom); Framatome Connectors Nederland B.V. (FC-Netherlands); and Framatome Connectors Sweden A.B. (FC-Sweden).

In the late 1980s, FCI acquired several connector companies in addition to Burndy-US. Burndy-US and Framatome US merged in 1989.[2] After being acquired by FCI, Burndy-US and other FCI

---

[2] Framatome US changed its name to Framatome Connectors USA Holding, Inc., on May 24, 1995. Burndy-US changed its name to Framatome US on May 31, 1995.

subsidiaries continued to manufacture electrical and electronic connectors.

Burndy-US's sales were $300 to $350 million per year in the years in issue.

3. <u>Furukawa and Sumitomo</u>

During the years in issue, Sumitomo Electric Industries, Ltd. (Sumitomo), and Furukawa Electric Co., Ltd. (Furukawa), manufactured electrical wires, cables, and connectors for Japanese electric utility companies. They competed against each other. They were among the largest cable manufacturers in Japan. Sumitomo had annual sales of $5 to $8 billion in the years in issue. Furukawa's sales were slightly less.

B. <u>Japanese Ministry of International Trade and Industry</u>

Japan restricted the entry of foreign-controlled companies into Japan after World War II. The Foreign Investment Law (Law No. 163 of 1950) and the Foreign Exchange Control Law (Law No. 228 of 1948) ensured that Japanese interests retained a majority interest in jointly owned companies. The Japanese Government began to relax these restrictions in 1964. In 1971, foreign investors could own 50 percent of Japanese companies in most industries, and 100 percent in many industries. By 1973, foreign investors could own 100 percent of Japanese companies in most industries. The Japanese Ministry of International Trade and Industry (MITI) had responsibility for controlling foreign

investment in Japan.  The Japanese Government prohibited direct foreign investment unless approved by MITI.

C.    Burndy-Japan

1.    Formation

Burndy-US wanted to enter the Japanese market in the early 1960s.  To do so, Burndy-US believed that it needed a distribution system in Japan that was owned and operated by a Japanese company.  Furukawa and Sumitomo had sales organizations and distribution systems for their products throughout Japan.  On September 28, 1961, Burndy-US, Furukawa, and Sumitomo agreed to form Burndy-Japan to manufacture and sell Burndy-US products in Japan.  Burndy-US, Furukawa, and Sumitomo each became the owner of 100,000 shares of common stock (i.e., a one-third interest) in Burndy-Japan.

The Burndy-Japan articles of incorporation (as amended) provide:  (a) Burndy-Japan shall have not more than 15 directors and not more than 3 auditors; (b) the board of directors shall elect one president and may elect one chairman and some (i.e., an unspecified number of) executive directors; (c) the chairman shall preside over meetings of the board of directors; (d) the president shall act for the chairman if there is no chairman or the chairman is unable to act; (e) the president shall preside over general meetings of shareholders; and (f) each shareholder shall have one vote per share.

The articles of incorporation also provide that a majority of the votes of the shareholders is required to adopt resolutions, except for the following, which require approval by shareholders who have shares representing more than 80 percent of the issued shares:  (a) Amendment of the articles of incorporation; (b) election of directors and auditors; (c) change in capital; (d) assignment of the entire or essential part of the business of the company; (e) entrusting a third party with management; (f) disposition of profits; (g) acquisition or disposition of shares of other companies; and (h) conclusion or alteration of license agreements.  The articles of incorporation authorized one class of stock consisting of 1,500,000 shares of common stock with a par value of ¥500 per share.

2.    Agreements Between Burndy-US, Furukawa, and Sumitomo From 1962 to 1973

On July 18, 1962, Burndy-US, Furukawa, and Sumitomo agreed to jointly manufacture and sell in Japan electronic connectors and related installation tools (1962 basic agreement).  The Burndy-Japan shareholders also agreed to a supplemental memorandum (1962 supplemental memorandum) and a technical assistance agreement (1962 technical assistance agreement).

From 1962 to 1968, Furukawa and Sumitomo continued to manufacture and sell connectors, which Burndy-US believed violated the 1962 basic agreement.  Burndy-US also disagreed with several aspects of Burndy-Japan's operations.  Burndy-US,

Furukawa, and Sumitomo negotiated to try to eliminate these problems. They signed a memorandum of agreement and confidential memorandum of understanding in 1968 to amend the 1962 basic agreement.

The Burndy-Japan shareholders signed a memorandum of understanding on October 24, 1972, which provided, among other things, that Burndy-US was "to have complete management control of Burndy-Japan" except that the following actions required the approval of all Burndy-Japan shareholders: (1) Change of capital; (2) license agreements with third parties; (3) purchase or sale of shares in Burndy-Japan or other companies; and (4) payment of dividends. Burndy-Japan paid Burndy-US a management service fee based on gross sales.

3. <u>1973 Basic Agreement</u>

Furukawa and Sumitomo continued to manufacture connectors after Burndy-Japan was formed. Farley believed Furukawa and Sumitomo gave higher priority to selling their own connectors than Burndy-Japan's connectors. The Burndy-Japan shareholders signed an agreement on March 13, 1973, to address these and other problems.

On March 19, 1973, the Burndy-Japan shareholders signed another agreement (1973 basic agreement) which provided the following:

a.   Furukawa and Sumitomo shall each transfer 25,000 shares of Burndy-Japan stock to Burndy-US in exchange for ¥2,750[3] per share, after which Burndy-US will own 50 percent and Furukawa and Sumitomo each will own 25 percent of the outstanding shares of Burndy-Japan.

b.   Burndy-Japan shares shall not be transferred without unanimous prior written consent of the shareholders.

c.   Burndy-Japan's board of directors shall consist of as many members as may be mutually agreed by the shareholders.  Each shareholder may vote its own stock to elect board members.

d.   Burndy-US shall nominate and the board shall elect the president of Burndy-Japan.  The president is Burndy-Japan's representative director under the Japanese Commercial Code with powers as provided by the board of directors.  The president may appoint officers and managers.

e.   The chairman presiding at board meetings shall have a second vote if there is no majority.  However, the chairman may cast that vote "only after careful and fair consideration of all aspects of the issue at hand", and "the issue at hand shall be further discussed in an effort to reach an amicable solution" if there is no majority vote at the shareholders meeting.

f.   Burndy-Japan may not take the following actions unless it receives the unanimous consent of the shareholders:

---

[3]   ¥ refers to Japanese yen.

(1) Change authorized or issued capital; (2) change or conclude any license agreements; (3) acquire an interest in or sell shares in other companies; (4) pay dividends; (5) transfer all or a major part of the business; and (6) entrust management to a third party (the "six veto powers").

g. The parties shall fully discuss "Any other important actions in Burndy-Japan for an amicable solution."

h. Furukawa and Sumitomo shall continue to sell and promote Burndy-Japan products aggressively. Burndy-US shall inform Furukawa and Sumitomo about new products that Burndy-US introduces.

i. The agreement shall be construed under Japanese law.

j. Disputes in connection with this agreement shall be settled by arbitration.

k. The document is the entire agreement of the parties and supersedes all previous agreements "in respect to the subject matter hereof".

Burndy-US did not pay a control premium when it acquired shares of Burndy-Japan from Furukawa and Sumitomo in 1973.[4]

4. Burndy-Japan's Presidents and Board of Directors

Kaiji Kambe (Kambe) began to work for Burndy-Japan in 1967. Kambe was an employee of Furukawa until 1972. He became an

---

[4] We discuss petitioners' contention to the contrary below pp. 41-44.

employee of Burndy-Japan in 1972 and president of Burndy-Japan on May 30, 1973. Burndy-US was dissatisfied with him as president and wanted to replace him.[5]

When Kambe retired, Sumitomo recommended Akimitsu Hijikata (Hijikata) to be president. Hijikata had previously worked for Sumitomo. Burndy-US had no nominees. Hijikata succeeded Kambe as president.

Burndy-US became dissatisfied with Hijikata as president in the late 1980s and early 1990s. Burndy-US wanted to remove him from office but could not without approval from Furukawa and Sumitomo.

5. <u>1988 Technical Assistance Agreement</u>

Burndy-US and Burndy-Japan signed technical assistance agreements in 1973, 1983, and 1988, which they negotiated at arm's length and which specified how Burndy-US would help Burndy-Japan produce and sell Burndy-US products. Those agreements also stated the amount of royalties and management fees Burndy-Japan would pay to Burndy-US and how Burndy-Japan would treat its and Burndy-US's patents. Burndy-Japan paid royalties to Burndy-US because Burndy-US provided Burndy-Japan licenses to manufacture and sell products and technical assistance.

---

[5] We discuss petitioners' contention to the contrary below p. 36.

After 1980, Furukawa and Sumitomo wanted to increase the amount of dividends they received from Burndy-Japan.  Burndy-US, Furukawa, and Sumitomo agreed to do so in 1988.

6.    Burndy-Japan's Independence From Burndy-US

From 1962 to 1993, Burndy-US tried unsuccessfully to direct Burndy-Japan away from the electrical connector business to the electronics business.  Furukawa and Sumitomo were more interested in the electrical than the electronics business.

In 1987, Burndy-US wanted but could not get from Burndy-Japan a list of products manufactured or sold by Burndy-Japan and information about certain sales by Burndy-Japan.

In 1990, Burndy-US asked Burndy-Japan for information to help Burndy-US better understand Burndy-Japan's competitors, markets, customers, and how Japanese shareholders affected the way Burndy-Japan did business.  Burndy-US did not know what new products Burndy-Japan had.  Burndy-US tried unsuccessfully to get Burndy-Japan to increase exports and to provide engineering assistance to help Burndy-US's Taiwan subsidiary.  Burndy-Japan did not give Burndy-US copies of patent applications as required by the technical assistance agreement in effect at the time, even though this information was important to Burndy-US.

In 1991, Burndy-Japan negotiated an agreement with a third party and disposed of Burndy-US's interest in a proprietary product outside Japan without Burndy-US's prior approval.

7.  Burndy-US's Purchase of 40 Percent of the Stock of Burndy-Japan in 1993

By 1990, Burndy-US had become dissatisfied with the electrical part of Burndy-Japan's business.  Burndy-US believed that Furukawa and Sumitomo placed more emphasis on their electrical businesses than on Burndy-Japan's electronics business.

By 1992, Burndy-US wanted to buy more shares of Burndy-Japan stock.  In April 1993, Burndy-US hired KPMG Peat Marwick (KPMG) to appraise Burndy-Japan stock.  KPMG used many different methods which resulted in 34 different estimates of the value of Burndy-Japan stock, averaging ¥7,501 per share.

FCI decided that it, rather than Burndy-US, would buy 40 percent of Burndy-Japan stock from Furukawa and Sumitomo and then sell it to Burndy-US.  On September 22, 1993, Burndy-US, Furukawa, and Sumitomo signed an amended basic agreement (1993 amended basic agreement) in which Furukawa and Sumitomo each agreed to sell to FCI 20 percent of the outstanding stock in Burndy-Japan for ¥5,208,000,000 (¥8,750 per share x 297,600 shares per shareholder x 2 shareholders).  FCI agreed to transfer the 595,200 shares of Burndy-Japan to Burndy-US by December 31, 1993.  Immediately before the parties completed the 1993 amended basic agreement, 1,488,000 shares of common stock of Burndy-Japan had been issued.  Burndy-US owned 744,000 shares, and Furukawa and Sumitomo each owned 372,000 shares.

The 1993 basic agreement superseded all previous agreements with respect to the subject matter in the 1993 agreement. The following provisions replaced the veto provision in the 1973 basic agreement:

(1) Actions involving the change or conclusion of significant license agreements or the acquisition or sale of shares in other companies will not be taken until the matter has been discussed at a Board of Directors meeting unless all of the Directors agree otherwise in writing.

(2) Except for transfers pursuant to Article 3 [of the 1993 basic agreement, which allows Burndy-Japan shareholders to sell their shares under certain conditions], the transfer of the whole or an essential part of the business of Burndy-Japan shall require a prior unanimous consent of all the parties hereto which own not less than 5% of the issued shares, provided that such transfers which concern the Electrical Division shall require the unanimous consent of all shareholders of Burndy-Japan.

Under the 1993 basic agreement, (1) Burndy-US could decide how many directors Burndy-Japan would have; (2) each party could nominate directors in proportion to their shareholdings; and (3) Furukawa and Sumitomo could each designate one director if each owned at least 5 percent of the stock of Burndy-Japan.

As a result of the 1993 stock sale, Burndy-US owned 90 percent of the stock of Burndy-Japan. Burndy-US removed Hijikata as president in 1993 after Burndy-US increased its stock ownership in Burndy-Japan to 90 percent.

Burndy-US first claimed Burndy-Japan as a CFC on its 1987 return. Burndy-US and Burndy-Japan prepared consolidated financial statements beginning in September 1993 and thereafter.

D. <u>Withholding Tax Issue</u>

1. <u>Purchase of TRW Daut & Reitz by Burndy-US</u>

In 1992, TRW, Inc. (TRW), a large U.S. multinational company, manufactured automotive components. TRW had a U.S. subsidiary, two German affiliates, and one Austrian affiliate (collectively, TRW Daut & Reitz). The U.S. subsidiary manufactured and sold automotive electronic connectors for the U.S. market. The German and Austrian affiliates did so for the German market.

TRW sold TRW Daut & Reitz in 1992 to help finance its expansion into the air bag business. FCI paid TRW $67,201,317 for TRW Daut & Reitz. TRW owned patents and had two U.S. patent applications related to air bag connectors pending in 1992. FCI wanted to buy the rights to those patents to prevent TRW from competing with FCI. TRW agreed to license the use of its patents. TRW also agreed not to compete in the air bag market. One noncompetition agreement covered the United States and Europe. The second covered Germany, and the third covered Austria.

FCI agreed to pay TRW for the three noncompetition agreements as follows:  (a) United States and Europe (US-Europe), $8 million; (b) Germany, $4 million; and (c) Austria, $3 million.[6]  FCI intended for Burndy-US to manufacture air bag connectors for sale in the United States and for FC-Italy to manufacture them for sale in Europe.  The German and Austrian noncompetition agreements primarily benefited FC-Germany.  The US-Europe noncompetition agreement primarily benefited Burndy-US and FC-Italy.

FCI bought the assets, stock, and covenants not to compete from TRW Daut & Reitz on December 22, 1992.  FCI paid TRW $10,663,467 for the U.S. assets of TRW Daut & Reitz and the US-Europe noncompetition agreement.  FCI transferred the U.S. assets of TRW Daut & Reitz and the US-Europe noncompetition agreement to Burndy-US on December 22, 1992.  In exchange for the assets and US-Europe noncompetition agreement, Burndy-US agreed to transfer to FCI property totaling $10,663,467, consisting of the stock of FC-Germany, FC-United Kingdom, FC-Netherlands, and FC-Sweden, and cash.  Burndy-US transferred the stock of FC-Germany to FCI in December 1992, and the stock of FC-United Kingdom, FC-

---

[6]  One noncompetition agreement stated that the covenant applied to the United States and Europe.  The second noncompetition agreement stated that the covenant applied to Germany.  The third noncompetition agreement stated that the covenant applied to Austria.

Netherlands, and FC-Sweden to FCI in July 1993. Burndy-US transferred the stock of FC-Italy and FC-Spain to FCI in 1994.

FC-Italy was a subsidiary of Burndy-US on December 22, 1992, when Burndy-US acquired the US-Europe noncompetition agreement.

2.   Transfer of 40 Percent of Burndy-Japan Stock to Burndy-US in 1993

Furukawa and Sumitomo each transferred 297,600 shares (20 percent) of Burndy-Japan stock to FCI in 1993. On July 30, 1993, and August 2, 1993, FCI paid FF300,356,423[7] for ¥5,210,000,000. FCI paid ¥2,604,000,000 to both Furukawa and Sumitomo, for a total of ¥5,208,000,000[8] on September 29, 1993.

The yen lost value relative to French francs from August 2, 1993, when ¥100 cost FF 5.8069, to September 29, 1993, when ¥100 cost FF 5.342. ¥5,208,000,000 cost FF278,211,360 on September 29, 1993. FCI could have paid FF22,145,063 (FF300,356,423 less FF278,211,360) fewer French francs by delaying its yen purchase to September 29, 1993. FF22,145,063 was the equivalent of $3,926,430 based on the September 29, 1993, exchange rate (FF5.6400 equaled $1) published by the Federal Reserve Bank of New York. FCI decided that Burndy-US should pay FCI for the exchange rate loss.

---

[7]   FF refers to French francs.

[8]   The record does not state what FCI did with the ¥2,000,000 difference between the ¥5,210,000,000 that FCI bought and the ¥5,208,000,000 that FCI paid to Furukawa and Sumitomo.

On September 20, 1993, FCI sold to Burndy-US 595,200 shares of Burndy-Japan stock for FF300,356,423.  FCI required Burndy-US to pay the difference of FF22,145,063 that resulted from the decreasing cost of yen in French francs.

Burndy-US transferred to FCI all of its interest in FC-Belgium and FC-Switzerland in 1993, and all of its interest in FC-Spain and FC-Italy in 1994.

OPINION

A.  Whether Burndy-Japan Was a Controlled Foreign Corporation in 1992

For the taxable year 1992, respondent reclassified foreign tax credits related to Burndy-Japan from the general limitation foreign tax credit basket under section 904(d)(1)(I) to a separate non-controlled corporation foreign tax credit basket under section 904(d)(1)(E).  Respondent reclassified the Burndy-Japan foreign tax credits solely on the ground that Burndy-Japan was not a CFC within the meaning of section 957(a).  The effect of this reclassification was to reduce petitioners' allowable foreign tax credit from Burndy-Japan for 1992 (including carryovers from 1988 and 1989) from $1,802,524 to $381,790.

1.  Voting Power Test and Stock Value Test

Petitioners contend Burndy-Japan was a CFC in 1992.[9]  A foreign corporation is a CFC if U.S. shareholders own more than

_____

[9]  See note 11, below, relating to why petitioners sought CFC status for Burndy-Japan.

50 percent of the voting power of all classes of its stock (the voting power test), sec. 957(a)(1), or if U.S. shareholders own more than 50 percent of the total value of its stock (the stock value test), sec. 957(a)(2).[10]

Burndy-US owned 50 percent of the stock of Burndy-Japan in 1992. For petitioners to prevail, they must show that, in 1992, either the voting power of Burndy-Japan stock held by Burndy-US exceeded 50 percent of the total combined voting power of Burndy-Japan stock, or the value of Burndy-Japan stock held by Burndy-US exceeded 50 percent of the total value of Burndy-Japan stock. Petitioners contend that Burndy-US met both tests. We disagree for the following reasons.

---

[10] Sec. 957(a) provides:

SEC. 957(a). General Rule.--For purposes of this subpart, the term "controlled foreign corporation" means any foreign corporation if more than 50 percent of--

(1) the total combined voting power of all classes of stock of such corporation entitled to vote, or

(2) the total value of the stock of such corporation,

is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation.

2.   Whether Burndy-US Owned More Than 50 Percent of the Total Combined Voting Power of the Stock of Burndy-Japan

Petitioners contend that Burndy-US owned more than 50 percent of the total combined voting power of Burndy-Japan because Burndy-US owned 50 percent of the stock of Burndy-Japan and, according to petitioners, had the following powers: (a) Burndy-US could select Burndy-Japan's board of directors and president and control the board's tie-breaking vote; (b) Burndy-US could dissolve Burndy-Japan; and (c) Burndy-US had management control of Burndy-Japan.  Petitioners point out that neither Furukawa nor Sumitomo exercised the veto powers created by the 1973 agreement and contend that Burndy-US paid Furukawa and Sumitomo a control premium in 1973 when Burndy-US obtained 50 percent of the stock of Burndy-Japan.

a.   Petitioners May Not Rely on the Doctrine of Substance Over Form

In 1973, Burndy-US, Sumitomo and Furukawa changed the structure of their ownership of Burndy-Japan so that Burndy-US would own 50 percent of the stock of Burndy-Japan and the two other Japanese companies would each own 25 percent.  It is clear that this change did not give Burndy-US more than 50 percent of the voting power of Burndy-Japan if "voting power" refers to the shareholders' percentage of stock ownership.  Nonetheless, petitioners now contend that Burndy-US owned more than 50 percent of the voting power of Burndy-Japan.

Petitioners rely on several cases in which the government successfully invoked the substance over form doctrine.  Koehring Co. v. United States, 583 F.2d 313 (7th Cir. 1978); Estate of Weiskopf v. Commissioner, 64 T.C. 78 (1975), affd. per curiam without published opinion 538 F.2d 317 (2d Cir. 1976); Kraus v. Commissioner, 59 T.C. 681 (1973), affd. 490 F.2d 898 (2d Cir. 1974); and Garlock Inc. v. Commissioner, 58 T.C. 423 (1972), affd. 489 F.2d 197, 201 (2d Cir. 1973).  In those cases, the issue was whether a U.S. shareholder or shareholders owning 50 percent or less (specifically, common stock with 45 percent of the voting power in Koehring, stock with 50 percent of the voting power in Estate of Weiskopf, and all of the common stock which had 50 percent of the voting power in Kraus and Garlock) of the stock of a foreign corporation had more than 50 percent of the voting power of the corporation for purposes of section 957(a)(1).  The theme running through these cases was the arrangement by the U.S. shareholders to have the foreign corporation issue a new class of voting preferred stock to foreign persons so as to avoid or terminate CFC status of the foreign corporation.  The Commissioner contended, and the courts in those cases held, that the foreign corporation remained a CFC because in substance the U.S. shareholders retained control of the corporation, notwithstanding the reduction of their nominal

percentage ownership of stock having 50 percent or less of the voting power.

Petitioners contend that those cases support their position that Burndy had more than 50 percent of the voting power and value of stock of Burndy-Japan. We disagree. The Government prevailed in those cases by relying on section 1.957-1(b)(2), Income Tax Regs., and by invoking the doctrine of substance over form. That doctrine generally allows the Commissioner to recharacterize a transaction according to its substance but does not allow a taxpayer to disavow a transactional form of the taxpayer's own choosing. See Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974); Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945); Gray v. Powell, 314 U.S. 402, 414 (1941); Higgins v. Smith, 308 U.S. 473, 477 (1940); Gregory v. Helvering, 293 U.S. 465 (1935); Nestle Holdings, Inc. v. Commissioner, 152 F.3d 83, 87 (2d Cir. 1998), affg. in part and revg. in part on other issues and remanding T.C. Memo. 1995-441. Generally, the Commissioner, not the taxpayer, can assert the doctrine of substance over form. See Higgins v. Smith, supra; Founders Gen. Corp. v. Hoey, 300 U.S. 268, 275 (1937); Gregory v. Helvering, supra at 469; Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 293 (1934); Television Indus., Inc. v. Commissioner, 284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959); Interlochen Co. v.

Commissioner, 232 F.2d 873, 877 (4th Cir. 1956), affg. 24 T.C. 1000 (1955); Norwest Corp. v. Commissioner, 111 T.C. 105, 140-147 (1998); Estate of Durkin v. Commissioner, 99 T.C. 561, 572 (1992). As the U.S. Court of Appeals for the Second Circuit (the court to which these cases are appealable) stated:

> It would be quite intolerable to pyramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less. [Television Indus., Inc. v. Commissioner, supra at 325.]

Petitioners made inconsistent claims concerning Burndy-Japan's CFC status. Before 1987, Burndy-US owned 50 percent of the stock of Burndy-Japan but it did not treat Burndy-Japan as a CFC. Burndy-US first claimed Burndy-Japan as a CFC on its 1987 return. Petitioners changed their position even though Burndy-US continued to own 50 percent of the stock of Burndy-Japan from 1987 to 1992, and the operational relationship between Burndy-US and Burndy-Japan did not change during those years; the only change was the tax law. See Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, sec. 631, 100 Stat. 2269.[11]

---

[11] Petitioners' new position in 1987 that Burndy-Japan was a CFC of Burndy-US coincided with a change in the tax law effective for tax years beginning in 1987. See sec. 1204 of the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, 100 Stat. 2532. Petitioners do not explain why they began to contend Burndy-Japan was a CFC in 1987; however, it is obvious that their purpose was to enable Burndy-US to increase its foreign tax credit and pay less U.S. tax.

Petitioners contend that they derived no U.S. tax benefit by not treating Burndy-Japan as a CFC before 1987.  However, their representations regarding the pre-1987 years are incomplete and unconvincing.  They deny having Subpart F income for the years 1987 through 1992, and they ask us to infer that they had little or no Subpart F income from 1983 to 1986.  They cite nothing in the record relating to 1983 through 1986 to support their contention, and they made no reference to the years before 1983. The taxpayer bears the burden of proving that it lacks a tax avoidance motive.  Hoffman Motors Corp. v. United States, 473 F.2d 254 (2d Cir. 1973). We are not persuaded that petitioners derived no U.S. tax benefit from not treating Burndy-Japan as a CFC before 1987.

A taxpayer may be permitted to invoke the doctrine of substance over form if the motive of the taxpayer is not primarily tax avoidance.  Hoffman Motors Corp. v. United States, supra at 257.  Petitioners' reversal of position regarding whether Burndy-Japan was a CFC was tax motivated.  Petitioners may not invoke the doctrine of substance over form here, and we need not consider petitioners' contention that Burndy-US, in substance, controlled Burndy-Japan in deciding whether Burndy-US owned more than 50 percent of the voting power of Burndy-Japan. See Hoffman Motors Corp. v. United States, supra.

In any event, for the purposes of completeness, we consider petitioners' contention on the merits.  We conclude that the outcome is the same because, as discussed next, Burndy-Japan was not a CFC of Burndy-US in either form or substance.

        b.    <u>Power of Any Burndy-Japan Shareholder To Block Various Actions by Burndy-Japan</u>

The articles of incorporation require a vote of shareholders holding more than 80 percent of the stock to:  (1) Amend the articles of incorporation; (2) elect directors and auditors; (3) change capital; (4) assign the entire or an essential part of the business of the company; (5) entrust a third party with management; (6) dispose of profits; (7) acquire or dispose of shares of other companies; and (8) make or alter license agreements.  Under the 1973 basic agreement, Burndy-US, Furukawa, and Sumitomo each had the power to veto six important categories of decisions by Burndy-Japan:  (1) Changes in capital; (2) changes in license agreements; (3) acquisition or sale of shares in other companies; (4) payment of dividends; (5) transfer of a major part of the business; and (6) entrusting management to a third party.

The six veto powers and the 80-percent supermajority requirements permitted either Furukawa or Sumitomo to block a wide range of important actions by Burndy-Japan.  We believe the veto powers and supermajority requirements were among the factors that prevented Burndy-US from controlling Burndy-Japan in 1992.

This Court and the U.S. Court of Appeals for the Eleventh Circuit made a similar finding in Alumax, Inc. v. Commissioner, 165 F.3d 822, 825 (11th Cir. 1999), affg. 109 T.C. 133 (1997). One of the issues for decision in Alumax was whether Amax possessed at least 80 percent of the voting power of the taxpayer as required to include the subsidiary on a consolidated return. Sec. 1504.[12] Amax owned one class of stock, and the Japanese shareholders owned a different class of stock. The four directors elected by Amax had two votes each. The two directors elected by the Japanese shareholders had one vote each. Thus, Amax controlled 80 percent of the directors' votes. The Japanese shareholders could veto: (1) Mergers; (2) purchase or sale of any asset worth at least 5 percent of Alumax's net worth; (3) partial or complete liquidation or dissolution of Alumax; (4) the expenditure of capital or disposition of assets worth more than $30 million; (5) the election or dismissal of Alumax's chief executive officer; and (6) the making of loans to affiliated

_____

[12] Sec. 1504(a)(2) provides:

   (2) 80-percent voting and value test.--The ownership of stock of any corporation meets the requirements of this paragraph if it--

      (A) possesses at least 80 percent of the total voting power of the stock of such corporation, and

      (B) has a value equal to at least 80 percent of the total value of the stock of such corporation.

corporations not in the ordinary course of business. Alumax, Inc. v. Commissioner, supra at 823. Alumax could not take any of these six actions without the approval of the majority of the directors elected by the holders of each class of stock.[13] Thus, the Japanese shareholders had a veto power over the six areas (six veto powers) because they owned a separate class of stock. The six veto powers reduced Amax's voting power relative to the voting power of the Japanese shareholders. Id. at 823. The Court held in Alumax that the veto powers caused Amax to have less than 80 percent of the voting power. Id. at 826.

Petitioners contend that the veto powers here were less important than those in Alumax. We disagree. A comparison of the veto powers in the instant cases show that they are similar to those in Alumax. See pp. 11-12, 27-29.

---

[13] Petitioners point out that, in Alumax, Inc. v. Commissioner, 165 F.3d 822, 823 (11th Cir. 1999), affg. 109 T.C. 133 (1997), if a director elected by a Japanese shareholder objected to a board action and the Japanese corporation ratified that objection within 14 days, the board vote would be ineffective, unless a panel of arbitrators ruled within 14 days that the vote would not have a material and adverse effect on the Japanese interests' investment. However, petitioners did not discuss how that procedure compares to the arbitration provided by par. j of the 1973 Basic Agreement. See p. 12. Further, the U.S. Court of Appeals for the Eleventh Circuit said that "On the six matters in which the directors voted by class, moreover, the Amax-elected directors' voting power effectively declined to 50%." Id. at 826. As in the instant cases, the Court of Appeals also said that veto provisions in Alumax, whether or not exercised, generally discouraged directors from voting against the Japanese interests. Id. n.4. Here, because of the six veto powers, Burndy-US did not own more than 50 percent of the voting power of Burndy-Japan.

Petitioners contend that respondent's reliance on <u>Alumax</u> here is inconsistent with Tech. Adv. Mem. 97-14-002 (Apr. 4, 1997) (the TAM).  Petitioners contend that the TAM precludes respondent from relying on a case (such as <u>Alumax</u>) which interprets the 80-percent test in section 1504 to interpret the 50-percent test in section 957(a).[14]  We disagree.  The TAM states that a taxpayer may not rely on cases interpreting section 957 to interpret section 1504 because the cases interpreting section 957 (which the taxpayer cited) allowed the Commissioner, not the taxpayer, to apply the substance over form doctrine to prevent taxpayer abuse.  It is well established that the Commissioner may rely on the substance over form doctrine to a greater extent than taxpayers.  See <u>Norwest Corp. v. Commissioner</u>, 111 T.C. at 140-147; <u>Estate of Durkin v. Commissioner</u>, 99 T.C. at 572; see also <u>Higgins v. Smith</u>, 308 U.S. at 477; <u>Founders Gen. Corp. v. Hoey</u>, 300 U.S. at 275; <u>Gregory v. Helvering</u>, 293 U.S. at 469; <u>Old Mission Portland Cement Co. v. Helvering</u>, 293 U.S. at 293; <u>Television Indus., Inc. v. Commissioner</u>, 284 F.2d at 325; <u>Interlochen Co. v. Commissioner</u>, 232 F.2d at 877.  Here, respondent, not petitioners, is citing a case interpreting section 1504.  Thus, respondent's reliance on <u>Alumax</u> here is consistent with the TAM.

---

[14]  Technical advice memoranda "may not be used or cited as precedent" unless regulations so provide.  Sec. 6110(k)(3). Regulations do not so provide here.

Petitioners contend that the supermajority voting requirements in the articles of incorporation meant little because the laws of most U.S. States require that, to change the number of authorized shares or to sell assets other than in the usual course of business, an 80-percent majority of shareholders must approve. Petitioners also contend that the veto powers differ little from statutory restrictions on domestic corporate boards provided by the Model Business Corporation Act (MBCA). We disagree. Petitioners cite no State laws or MBCA provisions that give 25-percent shareholders the veto powers present in these cases. The 1973 basic agreement, which created the veto powers that were in effect in 1992, states that the agreement shall be construed under Japanese law. Petitioners have not shown whether State law or MBCA provisions are similar to Japanese law.

Petitioners point out that dividends were more important to Furukawa and Sumitomo than to Burndy-US because Burndy-US received royalties and management fees. However, the agreements between Burndy-Japan shareholders relating to management fees and royalties expired after 5 years. Burndy-US had no guaranty that the management fees and royalties would continue; thus, its need for dividends could increase. Burndy-US's receipt of royalties and management fees does not show that Burndy-US controlled Burndy-Japan.

Petitioners point out that no Burndy-Japan shareholder exercised any of the six veto powers and contend that this shows that Burndy-US controlled Burndy-Japan. We disagree; it is more likely that Furukawa and Sumitomo never exercised the veto powers because the existence of those powers caused Burndy-US to cooperate with Furukawa and Sumitomo.

We conclude that the 80-percent vote requirement in the articles of incorporation and the six veto powers in the 1973 basic agreement reduced Burndy-US's voting power so it did not have more than 50 percent of the voting power of Burndy-Japan.

### c. Control of Burndy-Japan's Presidents and Board of Directors

Petitioners contend that Burndy-US controlled Burndy-Japan because it had, and exercised, the right to control, choose, and replace Burndy-Japan's presidents and board of directors from 1973 to 1993. Petitioners also contend that Burndy-US controlled the Burndy-Japan board of directors because, under the Burndy-Japan articles of incorporation and the 1973 basic agreement, Burndy-US had the right to name 5 of the 9 Burndy-Japan directors. We disagree.

### i. Election of Members of Board of Directors

The 1973 basic agreement stated that the shareholders could nominate persons to serve as members of the Burndy-Japan board of directors in proportion to the shareholder's ownership interests. The Burndy-Japan articles of incorporation required that, to be

elected, a director must receive the vote of 80 percent of the shareholders.  Thus, Furukawa or Sumitomo could block board membership for anyone Burndy-US nominated to serve as a director.

The Burndy-Japan shareholders agreed in 1973 that Burndy-US could nominate four directors and the president.  The president of a Japanese corporation must be a director.  ShÇhÇ (the Commercial Code of Japan), Law No. 48, March 9, 1899, as amended, at Book II, chap. 4, sec. 261-1, reprinted from Kitagawa, Doing Business in Japan, app. 5A (1994).  Thus, Burndy-US could not nominate a fifth member of the board of directors to serve as president unless Furukawa and Sumitomo agreed.

### ii.  Breaking Tie Votes

Petitioners contend that Burndy-US had the power to break a tie vote of the Burndy-Japan board of directors because Burndy-US could name the chairman or president, who could cast a second vote to break a tie.  We disagree.  First, Burndy-US could not unilaterally choose Burndy-Japan's president for reasons stated in the previous paragraph.  The articles of incorporation provide that the board of directors could elect a chairman.  Thus, Burndy-US could not unilaterally choose the chairman.  Second, the second vote to break a tie is invalid under Japanese law for reasons discussed next.

Hideki Kanda (Kanda), petitioners' witness who is a professor of law at Tokyo University, cited an article, Horiguchi

in Commentary on Corporate Law, Vol. 4, at 343 (1968), to support petitioners' contention that a director may cast more than one vote to break a tie.  However, he also cited an article, Tatasuta, Corporate Law (Kaishaho) 107-108 (2000), in which the author said that a director may not do so.

Respondent's expert in Japanese law, Michael K. Young (Young), cited two articles, Tanaka, Kaisha Ho Hyoron Jo, p. 370 (1967), and Tanaka & Namaki, Shinpan Kabushiki Kaisha Horitsu Jitsumu Handobukku, p. 423 (1967), which conclude that a provision which allows a "second or casting" vote by a chairman, or president acting for the chairman, to break a tie is invalid and unenforceable under Japanese law.

Respondent's witness, Yoshimasa Furuta (Furuta), who is licensed to practice law in Japan, reviewed Kanda's report. Furuta said that he agreed with Young that a provision authorizing a director to vote a second time to break a tie is invalid.  Furuta said that two standard textbooks on Japanese corporation law, Kitazawa, Corporation Law (New ed. 1982) at 347, and 1 Tanaka, Corporation Law 560 (Rev. ed. 1982), state that a provision authorizing a director to vote a second time to break a tie is invalid and unenforceable.  Furuta also said that Ministry of Justice publications state that a provision authorizing a second vote to break a tie is invalid and unenforceable.

Young also cited <u>Kamin</u>, an Osaka District Court case (filed on June 19, 1953). In <u>Kamin</u>, the Osaka District Court held that a director may not cast more than one vote on a board resolution. Young said that <u>Kamin</u> was "confirmed" (not further explained in the record) by both the Osaka Legal Affairs Bureau, Hanrei Jiho, No. 117, March 15, 1957, and the Civil Affairs Bureau of the Ministry of Justice, Minji Ko, No. 772, April 21, 1959.

Kanda said that <u>Kamin</u> has no precedential value because Japan is not a common law country, but he said that it may have persuasive value. Kanda said that the district court in <u>Kamin</u> applied the Japanese commercial code provision literally, but that the articles by Horiguchi and Tatasuta that he cited state that the literal approach fell out of favor. Furuta said that <u>Kamin</u> was published, which he said suggests it was an important decision. He also said that there are no precedents contrary to <u>Kamin</u>.

We find Young's and Furuta's position to be more convincing than Kanda's. We conclude on this record that, under Japanese law, the president of Burndy-Japan may not cast a tie-breaking vote if the president has already voted on the matter.

### iii. <u>Control of Burndy-Japan's President and Board of Directors by Burndy-US</u>

Petitioners contend that Burndy-US controlled Burndy-Japan's president and board of directors and dominated Burndy-Japan. We disagree.

Burndy-US did not control Burndy-Japan's presidents, Kambe and Hijikata, from 1973 to 1993. Burndy-US disapproved of Kambe and Hijikata as presidents and yet did not remove either of them from office until 1993. In 1993, Burndy-US removed Hijikata after Burndy-US had increased its stock ownership in Burndy-Japan from 50 percent to 90 percent. This suggests that Burndy-US lacked control before 1993.

Petitioners concede that Burndy-US disapproved of Hijikata as president, but they contend that Burndy-US did not disapprove of Kambe. Farley described Kambe as honest, practical, and protective of the interests of Burndy-Japan. Farley recalled two instances in which Burndy-US deferred to Kambe. Petitioners contend that Farley's testimony shows that Burndy-US did not disapprove of Kambe. We disagree. Cantor credibly testified that Farley was dissatisfied with Kambe as president.

Petitioners contend that Burndy-US controlled the three Burndy-US employees, the president, and the five Burndy-Japan employees who were members of the board. We disagree. Burndy-US presumably controlled the three Burndy-US employees who were directors. However, the record does not show that Burndy-US controlled the five Burndy-Japan employees who were selected as directors by unanimous agreement of the shareholders.

Petitioners contend Furukawa and Sumitomo agreed in 1973 to give Burndy-US complete control over Burndy-Japan. We disagree.

Farley testified only that the Japanese partners agreed to give Burndy-US management control over Burndy-Japan in 1973.[15] York testified that Burndy-US had no financial control over Burndy-Japan.

Cantor and Farley testified that Furukawa and Sumitomo provided no input to Burndy-Japan's day-to-day operations. Petitioners contend that this shows that Burndy-US controlled Burndy-Japan. We disagree; it shows only that Burndy-US provided day-to-day management.

York testified that Furukawa and Sumitomo were merely passive investors in Burndy-Japan and that Burndy-US neither sought nor received any input from them. Petitioners contend that Burndy-US completely dominated Burndy-Japan, including its corporate direction and strategy, product lines, marketing, manufacturing, hiring and personnel policies, and financial decisions. We disagree because: (1) Burndy-US tried unsuccessfully to force Burndy-Japan to drop the electrical connector business from 1962 to 1993; (2) Burndy-US tried unsuccessfully in 1987 to get from Burndy-Japan a list of products manufactured or sold by Burndy-Japan and information

---

[15] In a Jan. 27, 1973, letter to Burndy-US, which was part of the negotiations for the 1973 basic agreement, Furukawa and Sumitomo said: "We have purposely refrained from using the wording 'Burndy Corporation to have complete management control of Burndy-Japan'". Thus, that language was not included in the 1973 basic agreement.

about Burndy-Japan's import sales; (3) Burndy-US tried unsuccessfully to get Burndy-Japan to increase exports and to provide engineering assistance to Burndy-US's Hong Kong subsidiary in 1987; (4) Burndy-US tried unsuccessfully in 1991 and 1992 to get Burndy-Japan to give it copies of Burndy-Japan's Japanese patent applications, even though failing to file those applications with the U.S. patent office within a year could result in the loss of U.S. patent rights; and (5) Burndy-Japan sold Burndy-US's interest in a proprietary product outside Japan in 1991 without Burndy-US's approval.  We conclude that Burndy-US did not control or have the right to control the president or board of directors of Burndy-Japan before 1993, and that Burndy-US did not otherwise dominate or control Burndy-Japan.

d.    Ability To Dissolve Burndy-Japan

Petitioners contend that Burndy-US controlled Burndy-Japan because it had the power to force Burndy-Japan to dissolve.  We disagree.  Petitioners cite no authority to support this contention.  Under sections 94 and 404 of the Japanese Commercial Code, Law No. 48, March 9, 1899, as amended, reprinted from Appendix 5A of Doing Business in Japan, Zentaro Kitagawa (Matthew Bender & Co. 1994), a Japanese corporation dissolves if:  (a) So provided by the terms of the articles of incorporation; (b) it merges with another corporation; (c) the corporation is bankrupt; (d) a court orders dissolution; or (e) the shareholders resolve

to do so.  Under the Japanese Commercial Code, any shareholder may ask a court to order dissolution if the shareholders deadlock.  Burndy-US could cause a deadlock, but that would not necessarily cause a dissolution because a Japanese court could fashion an alternative remedy.  Thus, Burndy-US lacked unilateral power to force Burndy-Japan to dissolve.[16]

      e.   Financial Accounting and Underwood's Testimony

Generally, for financial accounting purposes, parent companies and subsidiaries in which the parent owns a controlling interest may consolidate financial statements.  Accounting Research Bulletin (ARB) No. 51, Consolidated Financial Statements (August 1959).  Burndy-US and Burndy-Japan did not consolidate their financial statements before 1993.  A parent usually owns a controlling interest if the parent owns a majority voting interest.  ARB 51, par. 2.  Petitioners first treated Burndy-Japan as a CFC for income tax purposes in 1987, following enactment of a tax law change relating to foreign tax credits which made it advantageous to do so.  See TRA 1986 sec. 1222(a)(1), 100 Stat. 2556.  Burndy-US's ownership interest in Burndy-Japan did not change between 1973 and 1993.  However, in deciding whether Burndy-US controlled Burndy-Japan in 1992, we do

---

[16] Petitioners' argument strains credulity because Burndy-US did not want to dissolve Burndy-Japan.  York testified that dissolution of Burndy-Japan would be apocalyptic for Burndy-US.  Burndy-US never discussed dissolving Burndy-Japan with Furukawa or Sumitomo.

not consider the fact that Burndy-US and Burndy-Japan did not file consolidated financial statements because petitioners' expert, Michael Underwood (Underwood), testified (and respondent does not dispute) that ARB 51 requires consolidation of a parent and a subsidiary only if the parent owns a majority of the voting shares of the subsidiary.

Underwood also testified that, based on Furukawa's and Sumitomo's veto powers, it is reasonable to conclude that Burndy-US had less control over Burndy-Japan than an owner would have over a subsidiary if the owner owned a majority of voting shares of the subsidiary. Underwood's testimony on this point supports the conclusion that Burndy-US did not control Burndy-Japan for tax purposes before 1993.

### f. Possibility of Undisclosed Agreements

Petitioners contend that Furukawa and Sumitomo agreed to give control of Burndy-Japan to Burndy-US in 1973 but did not want any documents reviewed by MITI to so state because that would have caused MITI to disapprove the transaction. The documents in our record did not give Burndy-US control over Burndy-Japan. The 1973 basic agreement stated that it was the entire agreement of the Burndy-Japan shareholders and that it superseded all previous agreements regarding matters in the 1973 basic agreement. We conclude that Furukawa and Sumitomo did not agree to give Burndy-US control over Burndy-Japan in 1973.

Furukawa and Sumitomo stated in a letter dated January 27, 1973, that they did not want to have any confidential agreements that would harm their relations with the Japanese Government. There is no evidence in the record that Furukawa and Sumitomo acted contrary to that stated intent. We conclude that the Burndy-Japan shareholders did not have an undisclosed agreement giving Burndy-US control over Burndy-Japan in 1973.

g. <u>Whether Burndy-US Paid a Control Premium for Burndy-Japan Stock It Acquired in 1973 or 1993</u>

Petitioners contend that Burndy-US paid a control premium when it acquired 50 percent of the stock of Burndy-Japan in 1973 and did not pay a control premium when it acquired an additional 40 percent of that stock in 1993. We disagree on both points.

First, Cantor stated in a memorandum to York in 1980 that he refused to pay a control premium when he negotiated the price of Burndy-Japan stock in 1973. Cantor testified at trial that Burndy-US paid a control premium in 1973, but he could not explain the conflict between his testimony and his 1980 memorandum.

Second, a 1978 Burndy-US memo to Farley states that Burndy-US should be prepared to pay a 20-percent control premium for increasing its ownership of Burndy-Japan stock to more than the 50 percent it then owned.

Third, FCI said in its 1993 annual report to shareholders that it acquired control of Burndy-Japan in 1993 when Burndy-US

acquired 40 percent of the stock of Burndy-Japan, bringing its total ownership to 90 percent.

Respondent's expert, Keith Reams (Reams), concluded that Burndy-US paid Furukawa and Sumitomo a control premium when it acquired an additional 40 percent of the stock of Burndy-Japan in 1993. Petitioners' expert, Masami Hashimoto (Hashimoto), concluded that Burndy-US did not. Reams's analysis on this point was more convincing than Hashimoto's. KPMG used various methods to appraise Burndy-Japan stock in 1993, resulting in 34 different estimates of value. Reams considered all of KPMG's estimates. Reams appraised (independently from KPMG) the shares that Burndy-US bought in 1993 and concluded that a 30-percent control premium had been paid. Respondent's expert, Mukesh Bajaj (Bajaj), said in his rebuttal to Hashimoto's report that most of the KPMG estimates of the value of Burndy-Japan stock in 1993 were less than the price Burndy-US paid. This suggests that Burndy-US paid a premium.

Petitioners contend that Reams's testimony is irrelevant because Reams did not use the liquidation method that respondent asks us to apply in deciding whether Burndy-US satisfies section 957(a)(2). We disagree; Reams's testimony is relevant to whether Burndy-US paid a control premium in 1973 or 1993.

Hashimoto did not appraise the shares that Burndy-US bought in 1993. He selected 1 of KPMG's 34 estimates (¥8,868 per share)

that he said used the most appropriate methodology. He inferred that Burndy-US did not pay a control premium because the agreed price of ¥8,750 per share was ¥118 less than the KPMG estimate that he chose.

As a basis for his inference, Hashimoto used Furukawa's and Sumitomo's offer to sell Burndy-Japan stock in 1993 for ¥10,900 per share which was about 20 percent higher than the sales price of ¥8,750 per share. Burndy-US did not accept that offer. We infer nothing from Furukawa's and Sumitomo's offer to sell because we do not know why Furukawa and Sumitomo asked for payment of ¥10,900 per share, and because this unaccepted offer does not establish the fair market value of Burndy-Japan stock. Premier Packing Co. v. Commissioner, 12 B.T.A. 637, 643 (1928); Parker v. Commissioner, 11 B.T.A. 1336, 1351 (1928); Wallis Tractor Co. v. Commissioner, 3 B.T.A. 981, 1001-1002 (1926).

Hashimoto opined that Burndy-US paid a 12-percent control premium for Burndy-Japan stock in 1973. Hashimoto said that Burndy-US paid a premium in 1973 equal to the difference between the final sales price and 80 percent of Furukawa's and Sumitomo's initial offer. Hashimoto discounted the initial offer by 20 percent to account for the fact that Furukawa and Sumitomo each reduced their shareholdings in Burndy-Japan from 33 to 25 percent.

Hashimoto said that Burndy-US paid a control premium because Burndy-US gained control over Burndy-Japan in 1973. We disagree for reasons stated above pp. 27-41.

Hashimoto was inconsistent in his approach to 1973 and 1993. For 1973, he relied on Furukawa's and Sumitomo's proposal based on an analogous company method based on data for 2 years. For 1993, he chose a KPMG value based on an analogous company method using data for 5 years. Finally, Hashimoto did not verify the accuracy of the data that Furukawa and Sumitomo used in their initial offer.

We conclude that Burndy-US did not pay Furukawa and Sumitomo a control premium to acquire Burndy-Japan stock in 1973 but did in 1993.

### h.   Conclusion Relating to the Voting Power Test

Petitioners point out that we and other courts have held that a 50-percent shareholder has more than 50 percent of the voting power of all of the stock if the taxpayer actually controls the corporation, citing Koehring Co. v. United States, 583 F.2d 313 (7th Cir. 1978); Estate of Weiskopf v. Commissioner, 64 T.C. 78 (1975); Kraus v. Commissioner, 59 T.C. 681 (1973); and Garlock Inc. v. Commissioner, 58 T.C. 423 (1972). Petitioners cite these cases to support their contention that Burndy-US owned more than 50 percent of the voting power of Burndy-Japan. We disagree. These cases are distinguishable because, here, the

veto powers, supermajority requirements, and the board of director selection rules prevented Burndy-US from controlling Burndy-Japan.

Section 1.957-1(b)(1), Income Tax Regs., provides that a taxpayer satisfies the 50-percent voting power test of section 957(a) if the taxpayer meets one of three requirements, all related to the power to control, or to exercise the powers of, the board of directors. Section 1.957-1(b)(1), Income Tax Regs., provides:

> (b) Percentage of total combined voting power owned by United States shareholders.--(1) Meaning of combined voting power. In determining for purposes of paragraph (a) of this section whether United States shareholders own the requisite percentage of total combined voting power of all classes of stock entitled to vote, consideration will be given to all the facts and circumstances of each case. In all cases, however, United States shareholders of a foreign corporation will be deemed to own the requisite percentage of total combined voting power with respect to such corporation --
>
> > (i) If they have the power to elect, appoint, or replace a majority of that body of persons exercising, with respect to such corporation, the powers ordinarily exercised by the board of directors of a domestic corporation;
> >
> > (ii) If any person or persons elected or designated by such shareholders have the power, where such shareholders have the power to elect exactly one-half of the members of such governing body of such foreign corporation, either to cast a vote deciding an evenly divided vote of such body or, for the duration of any deadlock which may arise, to exercise the powers ordinarily exercised by such governing body; or

(iii) If the powers which would ordinarily be exercised by the board of directors of a domestic corporation are exercised with respect to such foreign corporation by a person whom such shareholders have the power to elect, appoint, or replace.

Burndy-US does not meet the requirements of section 1.957-1(b)(1)(i), Income Tax Regs., because Burndy-US lacked the power to elect, appoint, or replace a majority of the board of directors. See discussion pp. 32-38.

Burndy-US does not meet the requirements of section 1.957-1(b)(1)(ii), Income Tax Regs., because it lacked the power to break tie votes and could not unilaterally exercise powers ordinarily exercised by a domestic board of directors. See discussion pp. 32-38.

Burndy-US does not meet the requirements of section 1.957-1(b)(1)(iii), Income Tax Regs., because the veto powers and supermajority requirements prevented Burndy-US from exercising powers over Burndy-Japan ordinarily exercised by a domestic board of directors. See discussion pp. 27-32.

We conclude that Burndy-US did not own more than 50 percent of the voting power of Burndy-Japan in 1992.

3. <u>Whether Burndy-US Owned More Than 50 Percent of the Value of Burndy-Japan Stock</u>

A foreign corporation is a CFC if U.S. shareholders own more than 50 percent of the total value of its stock. Sec. 957(a)(2). Petitioners contend that Burndy-US owned more than 50 percent of the value of Burndy-Japan stock in 1992. We disagree.

a. <u>Applicable Legal Standard</u>

Petitioners contend that the value of Burndy-Japan stock held by Burndy-US shareholders exceeded 50 percent of the total value of the three blocks of stock held by the shareholders of Burndy-Japan. Petitioners rely on <u>Mariani Frozen Foods, Inc. v. Commissioner</u>, 81 T.C. 448, 468-469 (1983), affd. sub nom. <u>Gee Trust v. Commissioner</u>, 761 F.2d 1410 (9th Cir. 1985). The taxpayer in <u>Mariani Frozen Foods</u> sought to avoid foreign personal holding company status by showing that it did not own more than 50 percent of the value of outstanding stock for purposes of section 552(a)(2).[17] We held that the value of foreign corporation stock held by U.S. shareholders was more than 50 percent of the total value of the blocks of stock held by all shareholders. <u>Id.</u> at 471. We agree with petitioners that the standard in <u>Mariani Frozen Foods</u> applies here.

---

[17] In <u>Mariani Frozen Foods, Inc. v. Commissioner</u>, 81 T.C. 448, 469 (1983), affd. sub nom. <u>Gee Trust v. Commissioner</u>, 761 F.2d 1410 (9th Cir. 1985), the taxpayers conceded that they would lose under a liquidation approach. However, we held against the taxpayers under a different test without considering the liquidation approach further.

b.   <u>Whether the Value of Burndy-Japan Stock Owned by</u>
<u>Burndy-US Was Greater Than 50 Percent of the Value</u>
<u>of the Blocks of Stock Held by All Shareholders</u>

Petitioners contend that the value of Burndy-Japan stock owned by Burndy-US was more than 50 percent of the value of the three blocks of stock owned by its three shareholders. Petitioners contend that a control premium applies in valuing the Burndy-Japan stock owned by Burndy-US because Burndy-US owned 50 percent of the stock and controlled Burndy-Japan during the years in issue. Similarly, petitioners contend that a minority discount or discount for lack of marketability applies to Furukawa's and Sumitomo's holdings.[18]

We find the testimony of respondent's experts, Bajaj and Alan C. Shapiro (Shapiro), about the rationale for applying control premiums and minority discounts to be useful in analyzing this issue. They testified that a premium applies in valuing a large block of stock if the holder of that block has the power to extract private benefits that are disproportionate to benefits available to minority shareholders (private benefits analysis).[19]

---

[18] Petitioners do not state the extent of the control premium, minority discount, or discount for lack of marketability. Rather they contend that any control premium, however small, would cause Burndy-US to own more than 50 percent of the value of Burndy-Japan stock.

[19] Barclay & Holderness, Private Benefits From Control of Public Corporations, 25 J. Fin. Econ. 371, 374 (1989), lists private benefits such as higher salaries for individual stockholders, below-market transfer prices for corporate

(continued...)

Petitioners did not offer any expert testimony relating to the merits of the private benefits analysis and did not cross-examine respondent's experts on this point.[20]

Burndy-US could not extract private benefits from Burndy-Japan because Furukawa and Sumitomo could veto several important types of corporate actions. These veto powers gave Furukawa and Sumitomo leverage over actions not subject to veto through the indirect or "log-rolling" effect; i.e., the ability of Furukawa or Sumitomo to pressure Burndy-US to act as requested on a matter not subject to veto to keep Furukawa or Sumitomo from vetoing an action subject to their veto powers.

Petitioners contend we should disregard Bajaj's testimony because he was biased. We disagree and find Bajaj's analysis to be helpful in deciding this issue.

Petitioners contend that they found no case or published analysis which supports Bajaj's theory. However, the private benefits analysis is discussed by Shleifer and Vishny in "A Survey of Corporate Governance", 52 J. Fin. 737, 747 (1997), and by Barclay and Holderness in "Private Benefits From Control of

---

[19](...continued)
stockholders, control amenities for individual stockholders, and synergies in production for corporate stockholders.

[20] Petitioners' counsel asked Bajaj whether he had used the words "private benefits" prior to his testimony in these cases and whether a certain hypothetical situation resulted in private benefits but did not ask Bajaj any other questions about the merits of the private benefits analysis.

Public Corporations", 25 J. Fin. Econ. 371-395 (1989). Barclay and Holderness said shareholders value the ability to "use their voting power primarily to extract corporate benefits to the exclusion of other shareholders". See also Bogdanski, Federal Tax Valuation, par. 4.03[1][e][v] n.171 (1996) (citing Barclay & Holderness and discussing why control enhances value); Barclay & Holderness, "Negotiated Block Trades and Corporate Control", 46 J. Fin. No. 3, 861, 873 (1991).

Petitioners contend that Burndy-US extracted private benefits from Burndy-Japan in the form of the management fee that Burndy-Japan paid Burndy-US, which petitioners contend greatly exceeded the cost of management. We disagree. Furukawa and Sumitomo agreed to pay the management fee; it was not "extracted" over their objection.

Petitioners contend that York testified that the management fee greatly exceeded the cost of management. We disagree. York testified that the management fee far exceeded the cost of sending executives to Burndy-Japan. The cost of providing management services included more than the cost of sending employees to Burndy-Japan; Burndy-US did a substantial amount of management work in the United States.

Petitioners contend that Burndy-US received private benefits through receipt by Burndy-US and FCI from Burndy-Japan of increasing amounts of royalties, commissions, and corporate

profits.  We disagree.  Burndy-US, Furukawa, and Sumitomo
negotiated the amount of the royalties, commissions, and profit
distributions at arm's length.  Generally, no disproportionate
benefit results from an arm's-length negotiation.  United States
v. Davis, 370 U.S. 65, 72 (1962) (the value of two properties
exchanged in an arm's-length transaction is presumed to be
equal); Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 39
(1937) (the value assigned to property by a buyer and seller
dealing at arm's length is persuasive evidence of its fair market
value); S. Natural Gas Co. v. United States, 188 Ct. Cl. 302, 412
F.2d 1222, 1252 (1969) (the price of property sold in an arm's-
length transaction is presumed to be its fair market value).

Petitioners point out that in United States v. Parker, 376
F.2d 402 (5th Cir. 1967), the U.S. Court of Appeals for the Fifth
Circuit held that a taxpayer who owned 80 percent of the
outstanding stock of a corporation owned more than 80 percent of
the value of the stock of that corporation.  Here, the veto
provisions, supermajority requirements, and rules for electing
directors increased the value of the Burndy-Japan stock held by
Furukawa and Sumitomo relative to the value of the stock held by
Burndy-US and decreased the value of the Burndy-Japan stock held
by Burndy-US relative to the value of the stock held by Furukawa
and Sumitomo.  See Alumax, Inc. v. Commissioner, 165 F.3d at 825.

The minority shareholders in Parker apparently had no veto powers.  Thus, Parker is distinguishable.

Petitioners contend that Burndy-Japan stock owned by Burndy-US was entitled to a control premium because Hashimoto so testified.  Petitioners also contend that a minority discount or discount for lack of marketability applies to Furukawa's and Sumitomo's holdings, causing Burndy-US to own more than 50 percent of the total value of the stock of Burndy-Japan.  We disagree for reasons stated pp. 27-32 and note 18 above.

c.    Conclusion Relating to the Stock Value Test

We conclude that Burndy-US did not own more than 50 percent of the value of Burndy-Japan stock in 1992.

B.    Whether Petitioners Are Liable for Withholding Tax

1.    Contentions of the Parties

Respondent contends that petitioners are liable for withholding tax under section 1442 on constructive dividends paid by Burndy-US to FCI in 1993.  Respondent contends that Burndy-US engaged in transactions involving FCI in 1993 in which FCI received $24,031,995 more than the value of property that Burndy-US received in exchange.  We use the term "excess value" to refer to that asserted excess in value.

Petitioners contend that the value of property that Burndy-US transferred to FCI in 1993 equaled the value of property it received and that all of the transactions to which respondent

refers were at arm's length.  Petitioners further contend that, under the U.S.-France Tax Treaty (the Treaty)[21] in effect in 1993, withholding tax does not apply under the circumstances present here.

We conclude that Burndy-US transferred excess value to FCI in 1993 in the amounts discussed below, and that the excess value is a constructive dividend to FCI which is subject to withholding tax under section 1442.

2.   Whether Burndy-US Transferred Excess Value to FCI in 1993

Respondent contends that, in 1993, Burndy-US transferred assets to FCI that were worth more than the value of assets Burndy-US received from FCI (excess value).  Respondent contends that Burndy-US transferred excess value to FCI in each of the following five ways:  (a) Burndy-US transferred to FCI European subsidiaries and cash worth more than 40 percent of the Burndy-Japan stock that FCI transferred to Burndy-US; (b) Burndy-US transferred additional value to FCI by using an inflated exchange rate to value French francs; (c) Burndy-US transferred additional value to FCI by using exchange rates for the cost of yen in French francs on July 30 and August 2, 1993, that differed from

---

[21]   References to the Treaty are to the Convention With Respect to Taxes on Income and Property, July 28, 1967, U.S.-Fr., 19 U.S.T. 5281; Protocol to the Convention With Respect to Taxes on Income and Property as Amended by the Protocols of Oct. 12, 1970, Nov. 24, 1978, Jan. 17, 1984, and June 16, 1988, T.I.A.S. 6518 and 11967.

the rates published by the Pacific Exchange Rate Service;
(d) Burndy-US paid for FCI's loss that resulted from the decrease
in the cost of yen (in French francs) after FCI bought yen which
it used to buy 40 percent of Burndy-Japan stock and before FCI
paid the yen to Furukawa and Sumitomo; and (e) Burndy-US
transferred value to FCI by paying FCI $6 million for a covenant
not to compete that benefited FCI and its subsidiaries.
Respondent contends that each of these methods was a separate
mechanism by which Burndy-US transferred excess value to FCI.  We
discuss each of these contentions next.

### a. Transfer of European Subsidiaries and Cash by Burndy-US to FCI in Exchange for 40 Percent of Burndy-Japan Stock

Burndy-US transferred to FCI the stock of FC-Belgium and FC-
Switzerland in 1993 and the stock of FC-Spain and FC-Italy in
1994.  Respondent contends that the value of those subsidiaries
in 1993 was $17,577,252 more than the value of the 40-percent
interest in Burndy-Japan that FCI transferred to Burndy-US.
Respondent relies on the fact that Burndy-US reported on its 1993
income tax return that the fair market value of 40 percent of
Burndy-Japan was $53,050,302 and the fact that the parties
stipulated that the fair market value of those subsidiaries was
$17,577,252 more than $53,050,302.

Petitioners contend that Burndy-US did not transfer excess
value to FCI in 1993 when Burndy-US transferred the stock of its

European subsidiaries and cash to FCI in exchange for 40 percent of the stock of Burndy-Japan.[22]  Petitioners contend:  (1) The value of the stock of the subsidiaries did not exceed the value of a 40-percent interest in Burndy-Japan; (2) the value of the stock of the European subsidiaries that Burndy-US reported on its 1993 income tax return is not relevant to deciding whether Burndy-US paid excess value to FCI; and (3) Burndy-US or Framatome US distributed the stock of FC-Spain and FC-Italy to FCI in 1994 rather than 1993, so that any associated transfer of value occurred in 1994.  We disagree in part with both parties.

According to the petition, Burndy-US reported on its 1993 return that it transferred $53,050,302 in stock and cash to FCI in exchange for 40 percent of the Burndy-Japan stock.[23] Respondent contends that, in so doing, Burndy-US reported that 40 percent of the Burndy-Japan stock was worth $53,050,302. Petitioners state in their brief that 40 percent of the Burndy-Japan stock was worth $51,411,007.  We accept respondent's position that 40 percent of the Burndy-Japan stock was worth $53,050,302 because that amount is more favorable for petitioners.

---

[22]  Alternatively, petitioners contend that, if the transfer of a 40-percent interest in Burndy-Japan resulted in a dividend to FCI, the dividend was $3,046,360.

[23]  The return is not in the record.

The parties stipulated that the fair market value of the stock of the four European subsidiaries was $70,627,554, which is $17,577,252 more than $53,050,302. Thus, we conclude that the value of the stock of the four European subsidiaries exceeded the value of 40 percent of the Burndy-Japan stock by $17,577,252.

Burndy-US transferred the stock of FC-Spain and FC-Italy to FCI in 1994. However, respondent contends that FCI constructively received the stock of FC-Spain and FC-Italy in 1993. We disagree.

A shareholder does not constructively receive a dividend during a year if the shareholder lacks an unrestricted legal right to demand payment in that year. Bush Bros. v. Commissioner, 73 T.C. 424, 438-439 (1979), affd. 668 F.2d 252 (6th Cir. 1982). The September 20, 1993, agreement between FCI and Burndy-US stated that Burndy-US was to transfer the stock of FC-Italy and FC-Spain to FCI in 1994,[24] and that the transfer of stock of FC-Italy and FC-Spain to FCI was to be effective on January 1, 1994. FCI agreed to defer its receipt of that stock to 1994. That stock was Burndy-US's payment for the stock of Burndy-Japan. Thus, FCI did not constructively receive the stock of FC-Italy and FC-Spain in 1993.

---

[24] Alternatively, respondent contends that FCI received a constructive dividend from the bargain sale of that stock in 1994, a year not before us.

We conclude that Burndy-US transferred to FCI excess value of $15,807,495 ($14,677,250 for FC-Belgium and $1,130,245 for FC-Switzerland) in 1993 by transferring the stock of FC-Belgium and FC-Switzerland to FCI.[25]

### b.    Exchange Rates

Respondent contends that Burndy-US transferred $2,140,546 to FCI by using an inflated exchange rate to value French francs in 1993 when Burndy-US transferred its European subsidiaries and cash to FCI in exchange for a 40-percent interest in Burndy-Japan.  Respondent bases this contention on exchange rates for December 30, 1993, published by the Federal Reserve Bank of New York.  Petitioners contend that the exchange rates that Burndy-US and FCI used were the result of arm's-length negotiations, and that the published rates are entitled to no weight.  We disagree in part with both parties.

FCI agreed to sell 595,200 shares of Burndy-Japan stock to Burndy-US for FF300,240,285 (or $53,050,302, the amount Burndy-US reported on its income tax return).  The exchange rate published by the Federal Reserve Bank of New York was FF5.8975 to $1 for

---

[25]  Burndy-US reported on its 1993 return that it paid $17,690,552 in cash as a part of that transaction.  Petitioners contend that Burndy-US paid only $17,289,162.  We need not decide which amount is correct because respondent did not determine that a constructive dividend resulted from the $17,690,552 cash component.  Similarly, we need not decide petitioners' contention that we must use the fair market value of francs, not Burndy-US's tax basis in those francs, to decide which amount is correct.

December 30, 1993.  Using that rate, the value of FF300,240,285 was $50,909,756 (300,240,285/5.8975) on December 30, 1993.  The difference between the value of FF300,240,285 ($53,050,302) and the value of those French francs based on the exchange rate published by the Federal Reserve Bank of New York ($50,909,756) is $2,140,546.

Petitioners contend that FCI and Burndy-US bargained at arm's length and that respondent improperly relied on Burndy-US's tax return to show that the Burndy-Japan stock was worth $53,050,302.  We doubt that FCI and Burndy-US bargained at arm's length because they were related.  We conclude that FCI and Burndy-US used an inflated exchange rate to transfer excess value to FCI from Burndy-US in 1993.

We agree with petitioners that the correct valuation date is December 29, 1993 (not December 30).  The exchange rate published for that date by the Federal Reserve Bank of New York was FF5.8400 to $1.  Thus, on December 29, 1993, FF300,240,285 was worth $51,411,008 (300,240,285/5.84).  The difference between the value of FF300,240,285 ($53,050,302) and the value of those French francs based on the published exchange rate for December 29, 1993 ($51,411,008) is $1,639,294.

We agree with petitioners that not all of the $1,639,294 is excess value for 1993 because Burndy-US did not transfer the shares of all four subsidiaries in 1993.  The values of the

subsidiaries when sold are as follows:  $35,000,000 for FC-Belgium, $2,168,245 for FC-Switzerland, $4,100,000 for FC-Spain, and $11,668,757 for FC-Italy.  The value of FC-Belgium and FC-Switzerland ($37,168,245) is 70 percent of the total value of the four subsidiaries ($52,937,002).  Seventy percent of $1,639,294 is $1,147,506.  We conclude that Burndy-US transferred excess value in the amount of $1,147,506 to FCI in 1993 through the use of inflated exchange rates.

    c.    <u>FCI's Purchase of Yen With French Francs on July 30 and August 2, 1993</u>

FCI paid FF300,356,423 on July 30 and August 2, 1993, to buy yen to pay Furukawa and Sumitomo for 40 percent of the Burndy-Japan stock.  Respondent contends that FCI paid $387,767[26] too much for those yen and required Burndy-US to pay that excessive

---

[26] Respondent calculates this amount as follows.  On July 30, 1993, FCI bought ¥2,620,728,213 for FF150,000,000 at a conversion rate of ¥.05723 to FF1.  The published exchange rate on that day was ¥.056700 to FF1.  ¥2,620,728,213 equaled FF148,595,289 using the published rate.  FCI paid FF1,404,711 (FF150,000,000 less FF148,595,289) more than the published rate when it bought ¥2,620,728,213 on July 30, 1993.  FF1,404,711 is $235,571 according to the published exchange rate of FF5.9630 to $1 on July 30, 1993.  Respondent contends that FCI received a $152,196 constructive dividend due to the Aug. 2, 1993, exchange rate difference.  On Aug. 2, 1993, FCI bought ¥2,589,271,787 for FF150,356,423 at a conversion rate of ¥.058069 to FF1.  On that day the published exchange rate was .057715 yen to FF1.  Thus, on Aug. 2, 1993, ¥2,589,271,787 equaled FF149,439,822 based on that exchange rate.  FCI paid FF916,601 (FF150,356,423 less FF149,439,822) more than the published exchange rate when it bought ¥2,589,271,787 on Aug. 2, 1993.  FF916,601 is $152,196 according to the published exchange rate of FF6.0225 to $1 on Aug. 2, 1993.  $235,571 plus $152,196 = $387,767.

cost to FCI.  Respondent contends that the cost was excessive because exchange rates for French francs to yen published by the Pacific Exchange Rate Service were less than the rates that FCI negotiated with unrelated banks.  We disagree.  FCI bought the yen after bona fide arm's-length negotiations with unrelated banks.[27]  We conclude that Burndy-US did not transfer excess value to FCI in 1993 by using exchange rates for the cost of yen in French francs on July 30 or August 2, 1993, that differed from rates published by the Pacific Exchange Rate Service.

    d.    <u>Payment by Burndy-US of the Loss That Resulted From the Decrease in the Cost of Yen (in French Francs) After FCI Bought Yen Which FCI Used To Buy 40 Percent of Burndy-Japan Stock and Before FCI Paid the Yen to Furukawa and Sumitomo</u>

FCI lost FF22,145,063 (FF300,356,423 less FF278,211,360) or $3,926,430 resulting from the decrease in the cost of yen relative to French francs between July 30 or August 2, 1993, when FCI paid French francs to buy yen with which it bought 40 percent of Burndy-Japan stock, and September 29, 1993, when FCI paid the yen to Furukawa and Sumitomo.[28]  Burndy-US paid the FF22,145,063

---

[27]  In light of this conclusion, we need not decide petitioners' contention that constructive dividends resulting from different exchange rates is a new issue.

[28]  On July 30 and Aug. 2, 1993, FCI paid a total of FF300,356,423 to buy ¥5,208,000,000.  FCI paid ¥5,208,000,000 to Furukawa and Sumitomo on Sept. 29, 1993.  The yen to franc exchange rate decreased between the time that FCI bought the yen and Sept. 29, 1993.  On Sept. 29, 1993, FCI calculated that ¥100 traded for FF5.342.  At that conversion rate, FF278,211,360

(continued...)

to FCI.  Respondent contends that Burndy-US paid, and thus transferred excess value of, $3,926,430 to FCI for exchange rate losses (hedging loss) that FCI incurred when the cost of yen decreased after FCI bought the yen and before FCI paid the yen to Furukawa and Sumitomo.

Petitioners contend that FCI did not receive excess value from Burndy-US because Burndy-US ultimately received the 40-percent interest in Burndy-Japan.  Petitioners contend that the exchange rate losses due to the reduced cost of yen were Burndy-US's losses and not FCI's.  We disagree.  FCI and Burndy-US structured the transaction so that FCI and not Burndy-US bought the yen, paid it to Furukawa and Sumitomo, and received the 40-percent interest in Burndy-Japan.  Petitioners now seek to recast the form of the transaction as if Burndy-US, and not FCI, had bought the yen, paid it to Furukawa and Sumitomo, and received 40 percent of the stock of Burndy-Japan.  FCI and Burndy-US may not do so because, ordinarily, taxpayers are bound by the form of the transaction they have chosen; taxpayers may not in hindsight recast the transaction as one that they might have made in order to obtain tax advantages.  Estate of Leavitt v. Commissioner, 875 F.2d 420, 423 (4th Cir. 1989), affg. 90 T.C. 206 (1988); see Grojean v. Commissioner, 248 F.3d 572, 576 (7th Cir. 2001)

---

[28](...continued)
equals ¥5,208,000,000.  FF22,145,063 equaled $3,926,430 using the Sept. 29, 1993, published conversion rate of FF5.6400 = $1.

(taxpayers are bound by the structure of their transaction), affg. T.C. Memo. 1999-425.

We conclude that Burndy-US transferred excess value of $3,926,430 to FCI in 1993 by paying FCI's hedging loss in that amount.

### e. The Covenants Not To Compete

The US-Europe covenant not to compete had a fair market value of $8 million, of which $2 million is attributable to TRW's not competing in the U.S. and $6 million is attributable to TRW's not competing in Europe (European component of the US-Europe covenant). Petitioners contend that Burndy-US paid $6 million to FCI and received the European component of the covenant not to compete worth $6 million and that this benefited Burndy-US and its subsidiaries. Respondent contends that Burndy-US transferred $6 million to FCI by paying FCI that amount for a covenant not to compete that benefited FCI and its subsidiaries. In essence, respondent contends that Burndy-US received nothing for the $6 million it paid to FCI. We disagree.

FC-Italy made automotive air bag connectors for the European market. FCI obtained the European component of the US-Europe covenant not to compete primarily to benefit FC-Italy. FC-Italy was a subsidiary of Burndy-US on December 22, 1992, when Burndy-US acquired the covenant not to compete, and throughout 1993, the year in issue. Thus, Burndy-US's payment to FCI for the European

component of the covenant not to compete benefited Burndy-US's subsidiary, FC-Italy.

FC-Germany, a subsidiary of FCI in 1993, also manufactured automotive air bag connectors. Respondent contends that buying the European component of the US-Europe covenant not to compete resulted in a constructive dividend to FCI because FC-Germany could also benefit from the European component of the US-Europe covenant not to compete. We disagree. FCI acquired the European component of the US-Europe covenant not to compete to benefit FC-Italy, not FC-Germany. FCI obtained two other covenants not to compete (Germany and Austria) to benefit FC-Germany. A corporate distribution is not a constructive dividend if the distribution was not primarily for shareholder benefit. See Sammons v. Commissioner, 472 F.2d 449, 452 (5th Cir. 1972), affg. in part, revg. in part on other issues, and remanding T.C. Memo. 1971-145; Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1030 (1987), affd. 914 F.2d 396 (3d Cir. 1990). The US-Europe covenant not to compete was not primarily for the benefit of FCI.

We conclude that Burndy-US did not transfer excess value to FCI in 1993 by paying $6 million for the European component of the US-Europe covenant not to compete.

### f. Conclusion About Transferred Excess Value

Burndy-US transferred $20,881,431 ($15,807,495 + $3,926,430 + $1,147,506) in excess value to FCI in 1993. Burndy-US

distributed and FCI received excess value of $15,807,495 in 1993 when Burndy-US transferred the stock of FC-Belgium and FC-Switzerland to FCI.  Burndy-US transferred excess value of $3,926,430 to FCI in 1993 because Burndy-US paid that amount to FCI for the currency exchange loss.  Finally, Burndy-US paid $1,147,506 to FCI as a result of the exchange rate it used for French francs.

### 3.   The U.S.-France Tax Treaty and 1988 Protocol

Petitioners contend that, even if Burndy-US transferred excess value to FCI, they are not liable for withholding tax because the U.S.-France Tax Treaty limits application of the withholding tax to dividends "actually distributed."  According to petitioners, a transfer of excess value is a constructive dividend and is not "actually distributed."  We disagree.

Article 9(2)(b) of the Treaty states:

> (2) Dividends derived from sources within a Contracting State by a resident of the other Contracting State may also be taxed by the former Contracting State but the tax imposed on such dividends shall not exceed--

>     *     *     *     *     *     *     *

>     (b) When the recipient is a corporation, 5 percent of the amount actually distributed * * *.

The 1988 Protocol[29] defines "dividends" to include "income treated as a distribution by the taxation laws of the Contracting State of which the company making the distribution is a resident." 1988 Protocol at Art. IV, amending Art. 9, par. 7 of the Treaty.

Petitioners contend that the 1988 Protocol does not define the phrase "actually distributed". Petitioners contend that neither the Treaty nor the 1988 Protocol applies here because Burndy-US did not distribute the amounts which respondent contends give rise to constructive dividends. We disagree. Burndy-US distributed $20,881,431 in excess value to FCI in 1993.[30]

---

[29] 1988 Protocol at Art. IV, amending Art. 9, par. 7 of the Treaty, defines "dividend" as:

> income from shares, "jouissance" shares or "jouissance" rights, mining shares, founders shares or other rights, not being debt claims, participating in profits, <u>as well as income treated as a distribution by the taxation laws of the Contracting State of which the company making the distribution is a resident</u>. [Emphasis added.]

[30] In light of our conclusion that the Treaty and 1988 Protocol do not bar application of withholding tax, we need not decide petitioners' contention that 26 C.F.R. sec. 514.21(a)(3)(i) (2000), French Tax Treaty Regs., is invalid. That regulation provides that "the gross amount actually distributed includes amounts constructively received." <u>Id.</u> Sec. 514.21(a)(3)(i), French Tax Treaty Regs., was filed on Jan. 3, 1969, well before the 1988 Protocol. T.D. 6986, 1969-1 C.B. 365, 369, 375.

The notice of deficiency for withholding tax for 1993 states:

> 1(a) <u>Deemed Dividend Distributions</u>
>
> It is determined that during the taxable year 1993 deemed dividend distributions were made by you to Framatome Connectors International (FCI), a French corporation, in the amount of $54,006,312.00, as computed below, which are subject to withholding tax as computed in "5(a)."

Petitioners contend that respondent's use of the phrase "deemed dividend distributions" establishes that Burndy-US did not actually distribute dividends to FCI. We disagree. Burndy-US actually distributed the constructive dividends in these cases to FCI in 1993 because FCI received excess value from Burndy-US in 1993. Petitioners' position assumes that only non-constructive dividends are distributed. We disagree. A dividend, deemed or constructive, is distributed when the shareholder receives excess value from the corporation as occurred here.

The parties stipulated that Burndy-US sold all of the stock of its European subsidiaries to FCI. Petitioners contend that the stipulation prevents us from concluding that Burndy-US sold only some of the stock and that the rest were dividends. We disagree. We do not construe the stipulation to bar our consideration of respondent's theory that Burndy-US paid constructive dividends to FCI.

A constructive dividend is distributed when a corporation transfers excess value to its shareholders from corporate earnings and profits. A corporate distribution for the shareholder's benefit is a constructive dividend. Sec. 316(a); Rushing v. Commissioner, 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888, 893 (1969); Sachs v. Commissioner, 277 F.2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959); Gulf Oil Corp. v. Commissioner, 89 T.C. at 1028; Rapid Elec. Co. v. Commissioner, 61 T.C. 232, 239 (1973). Petitioners contend that any excess value that Burndy-US transferred to FCI in 1993 is not a constructive dividend because it was the result of arm's-length negotiations between FCI and Burndy-US. We disagree. We doubt that FCI and Burndy-US bargained at arm's length because they were related. See discussion pp. 57-58. We conclude that Burndy-US paid $20,881,431 in constructive dividends to FCI in 1993.

4.  Conclusion

We conclude that petitioners are liable for withholding tax on $20,881,431 of constructive dividends that Burndy-US paid to FCI in 1993.

To reflect concessions and the foregoing,

Decisions will be

entered under Rule 155.